Argued February 13, reversed and remanded April 15, rehearing denied June 24, costs taxed July 8, 1924.

## LEW WALLACE *v.* AMERICAN LIFE INSURANCE CO. OF DES MOINES, IOWA.

(225 Pac. 192; 227 Pac. 465.)

**Appeal and Error—Theory Under Which Case Tried cannot be Changed on Appeal.**

1. Where a case has been tried on a certain theory, with the acquiescence of the parties, it must be so continued on appeal.

**Insurance—Forfeiture by Agent in Nature of Penalty, and must be Pleaded.**

2. A defense to an action by general insurance agent against the company for breach of the agency contract that plaintiff forfeited all claims accruing under the contract by entering into the employment of another company, not being pleaded, was not available, since forfeiture is in the nature of a penalty, and must be pleaded.

**Insurance—Agent's Declaration as to Subsequent Employment Held Admissible to Lessen or Overthrow Damages.**

3. In an action by general insurance agent for breach of the agency contract, company *held* entitled to prove agent's declarations respecting his subsequent employment to lessen or overthrow his damages.

**Insurance—Agent Held Entitled to Recover Only Present Value of Sums Due on Renewal of Policies.**

4. A general insurance agent, suing for breach of his agency contract, *held* entitled to recover only the present value of sums due him on renewal policies.

**Insurance—Agent Entitled to Damages for Unlawful Revocation of Agency Contract.**

5. An insurance agent is entitled to damages for the unlawful revocation of his agency contract, if the contract was of value.

**Evidence—Duty of Witness to State Facts Within Personal Knowledge Only.**

6. It is the duty of a witness to state facts within his personal knowledge, and not to testify to hearsay or give opinion evidence.

**Evidence—Expert Testimony Should be Received and Weighed With Caution.**

7. Expert testimony should be received and weighed with caution.

**Evidence—Opinion Evidence as to Value of Insurance Agency Contract Held Inadmissible.**

8. Opinion evidence as to the value of an insurance agency contract is inadmissible.

**Trial—Objection to Incompetent Evidence not Waived by Offering Similar Incompetent Evidence in Rebuttal.**

9. It was not a waiver of litigant's objection to incompetent opinion evidence that he offered similar incompetent evidence in rebuttal.

**Trial—Objection not Waived by Cross-examining on Matter Admitted Over Objection.**

10. An exception is not waived by cross-examining on the matter admitted over objection.

---

4. Right of insurance broker to commissions on renewal premiums after termination of agency, see note in Ann. Cas. 1912A, 529.

5. Right of one employed on commissions to recover for loss of profits where employment is unlawfully terminated, see notes in 53 L. R. A. 33; L. R. A. 1916B, 872.

10. Waiver of objection to testimony by cross-examination, see note in 33 L. R. A. (N. S.) 103.

See 3 C. J., p. 718; 22 C. J., pp. 199, 308, 485, 575 (1925 Anno.), 735; 32 C. J., pp. 1081, 1082, 1083; 38 Cyc., pp. 1399, 1522.

Evidence—Letter Held Properly Excluded as Offer of Compromise.

11. In an action by insurance agent for breach of the agency contract, *held*, that the court did not abuse its discretion in excluding a letter written by plaintiff offering to settle for a specified sum, on the ground that it was an offer to compromise under Section 879, Or. L.

Trial—Construction of Written Instrument is for Court.

12. Under Section 715, Or. L., the construction of a written instrument is for the court.

### ON PETITION FOR FURTHER OPINION.

Insurance—Evidence of Company's Breach of Contract With General Agent Held Sufficient to Go to Jury.

13. Evidence *held* sufficient to go to jury on question of company's breach of contract with general insurance agent.

From Multnomah: GEORGE ROSSMAN, Judge.

Department 2.

This is an action at law, in which the plaintiff seeks to recover from the defendant the sum of $77,327.91, damages, for the alleged breach of an insurance agency contract.

On November 10, 1915, the plaintiff and defendant entered into a contract whereby Lew Wallace, plaintiff herein, was appointed general agent of the defendant insurance company for the State of Oregon. The contract contains no express provision relating to the duration of the agency.

It is the contention of the plaintiff that on May 18, 1921, the defendant breached its agency contract, and that as a result thereof he has suffered damages in the amount hereinbefore stated. The complaint avers that the defendant is indebted to plaintiff in seven several sums, amounting in the aggregate to $77,113.91, all of which the defendant denies and by its counterclaims avers that the plaintiff is indebted to it in two several sums aggregating $4,739.34.

Plaintiff's first claim is for the recovery of the sum of $1,534.36, based upon commissions due him upon second and third year premiums received by the insurance company up to February 22, 1922, for insurance business written by plaintiff for defendant.

A second claim, for the sum of $2,095.52, is based upon second and third year premiums due, accruing after February 22, 1922, for like services.

A third claim, for the sum of $218.67, is based upon fourth or subsequent years' premiums received by defendant up to February 22, 1922.

A fourth claim is for the sum of $22,515.36, renewal premiums upon policies written for defendant by plaintiff, which premiums were to accrue subsequent to February 22, 1922.

A fifth claim is for the sum of $750.00, alleged to be due as salary at the rate of $100 per month, from May 15, 1921.

A sixth claim is for the sum of $50,000 damages, the alleged value of the insurance agency arising out of the contract averred to have been breached.

The plaintiff attempts to recover all of these separate amounts in his first cause of action.

A second cause of action alleged in the complaint consists of one claim in the sum of $214, arising from a proposed bonus averred by plaintiff to have been promised him by defendant.

The defendant's first counterclaim is for the recovery of $3,191.33, averred to be due it from plaintiff, which sum defendant alleged had been collected by plaintiff and was due the defendant for renewal premiums and renewal premium notes, and defendant alleged that the plaintiff had obtained the cash proceeds thereof in the sum above named.

111 Or.—33

For a second counterclaim the defendant avers that during the life of the insurance contract involved herein there became, and was, due, under the terms of that contract, from the plaintiff and the agents associated with him, for net amounts, commonly known as "nets," the aggregate sum of $1,548.01.

Upon trial, the jury found that the plaintiff was entitled to recover from the defendant the gross sum of $75,909.67; that the defendant was entitled to recover its two counterclaims amounting in the aggregate to the sum of $4,739.34; and, that the plaintiff was entitled to recover of and from the defendant the net sum of $71,170.33.

The contract involved in this controversy occupies pages 22 to 38, inclusive, of the abstract.

It is averred in the complaint, and provided in the contract, that Lew Wallace should act as the general agent of the American Life Insurance Company, of Des Moines, Iowa, within this state, in the business of soliciting and writing life insurance exclusively as the defendant's agent, and devote his time, talents and energy to canvassing for applications for life insurance, and give his personal attention to the renewal of all business written for the defendant. Among other things, the complaint sets out the following provisions of the contract:

"20. The first party agrees to pay the second party (during the continuance of this agreement), a renewal commission of five per cent. commencing with the fourth policy year and continuing until the twentieth, but not beyond the renewal paying period of any policy, on all cash renewal premiums received by the first party on business produced by the second party and his agents, excluding first party's special $5,000 Ordinary Life Policy.

"21. If the second party, after having been continuously in the service of the first party for five years or longer, shall elect to discontinue his employment as state agent and gives notice of such intention to the first party in writing, the above renewal commission provided in Section 20 shall be paid to the second party after his active employment shall have ceased for the same period that he would have been entitled to such compensation if he had continued actively in the service of the first party, provided that the second party and his agents shall have produced not less than $150,000, paid and accepted insurance, other than Term policies, in each calendar year while this agreement was in force and, provided that not less than sixty per cent. of all the business produced by the second party and his agents and accepted by the first party during the continuance of this agreement, excluding business produced in the current calendar year and policies carried under extended insurance, shall be in force. It is specially agreed that if the second party shall discontinue his active relation with the first party and shall engage in the employment or service of any other life insurance corporation as soliciting agent or agency manager, then, subject to all the conditions governing the payment of renewal commissions, the first party shall be bound only to pay such renewals for a period of five years after the active employment of the second party shall have ceased. Otherwise, such compensation shall continue as above provided. * *

"23. In addition to the compensation otherwise provided in this agreement, the first party agrees to pay the second party a salary of $1,200 for the first year of this agreement, payable in twelve equal monthly installments. If the second party and his agents shall produce $150,000 paid and accepted business, excluding Term policies, during the year commencing January 1 and ending December 31, 1916, then the first party agrees to continue said salary for the year 1917, and thereafter the continuance of such salary

shall be subject to the production of not less than $200,000 paid and accepted business by the second party and his agents during the preceding year, excluding Term policies, and the renewal of at least sixty per cent. of the outstanding renewal premiums in the state of Oregon which shall become due and payable in each calendar year. When the renewal commissions, excluding the first year advance against renewals, due and payable to the second party in any calendar year, shall equal or exceed the sum of $2,400, then the perpetuation of the salary provision thereafter shall be optional with the first party.

"24. The second party is hereby appointed state agent for Oregon, with his principal place of business at Portland, Oregon, and agrees to give diligent and faithful attention to the performance of all his duties, agrees to be governed by and comply with the insurance laws of Oregon to the best of his knowledge, agrees to notify the first party promptly of any matter which should receive attention at its principal place of business, agrees to furnish such reasonable surety bond as may be required of him by the first party, agrees to establish branch agencies, local agencies, and do all acts and things which may be properly required of a state agent, and in the discharge of all these duties to be governed by the instructions of the first party. The difference in the compensation provided in other agency contracts in the state of Oregon and the compensation provided in this agreement shall belong to the second party, subject to the terms of this agreement and the faithful performance of his duties."

The plaintiff further alleges:

"That in and by said contract it was further mutually agreed that plaintiff should receive for his services certain commissions upon the first year's premiums paid upon policies written by him, all of which have been paid to plaintiff, and that he should receive certain commissions upon renewal premiums for the second and third years upon such policies;

and in and by said contract it was further mutually agreed that certain cash advances should be made to plaintiff on account of renewal premiums, the rates and amounts of the said renewal premiums and cash advances and the terms and conditions upon which the same were to be paid being as follows:

" 'Commission of Renewal Premiums.

" 'In addition to the aforesaid commissions for the cash and accepted premiums on the first year of assurance, the first party agrees to pay the following renewal commissions to the second party, and make cash advances to the second party against said renewals on the basis provided in the renewal commissions schedule, namely:

" ' (Here follows schedule of commissions and cash advances.)' "

It is averred in the complaint that by the terms of the contract the payment of such commissions upon renewals was made dependent upon the collection of the renewal premiums, and that plaintiff was thereby given an interest in such collections and in the perpetuation of the policies written by him. It is further alleged:

"That the said second and third years' renewal commissions upon policies written by plaintiff in the years 1915, 1916, and 1917, have been paid."

It is averred at paragraph 7 of plaintiff's first cause of action:

"That in and by said contract it was further provided that the same might be terminated by defendant solely on account of culpable negligence, failure to carry out instructions of defendant, willful violation of law, failure to comply with the conditions of said contract, or grossly improper conduct by plaintiff herein. * * And it was the understanding and agreement of the parties hereto in entering into said

contract that the same should continue and remain in force so long as plaintiff should comply with his obligations thereunder, as provided by the same contract. * *

"8. That in pursuance of said contract * * plaintiff * * established and built up for defendant an agency in the city of Portland * * , and through his efforts and those of his sub-agents * * has written life insurance in defendant company in excess of $1,512,000 of which more than 75 per cent remained in good standing * * on the 18th day of May, 1921. * *

"9. That plaintiff has performed all the covenants, conditions and agreements set forth in said contract by him to be performed, except that the provisions of said contract relative to the time and manner of payment by plaintiff to defendant of net premiums have from time to time been waived or modified by the allowance of additional time to plaintiff for the making of such payments, and plaintiff has performed the said provisions relative to payments to be made by him, as so waived or modified."

Plaintiff further avers that the defendant breached its contract with plaintiff in the following particulars:

"That defendant * * entered into an arrangement and agreement with Northern Assurance Co., a Michigan corporation, under the terms of which a controlling interest in defendant corporation was to be sold and transferred to said Northern Assurance Co., and the business and affairs of said defendant corporation were to be conducted, and the policies issued by it were to be issued, under the name of Northern Assurance Co. * *

"That on or about the 18th day of May, 1921, defendant refused absolutely to comply further with the terms and conditions of said agency contract. * *

"That defendant refused to continue plaintiff in its employ, except under a contract to be entered into with said consolidated Northern Assurance Co. * *

"That defendant denied the right to plaintiff to any further special renewal commissions or ordinary re-

newal commissions upon the business heretofore written by him * * and refused to account to plaintiff for such commission, or to pay the same, or any part thereof, to plaintiff, * * and refused to pay plaintiff his salary of $1,200 for the year 1921, or any part thereof, except the sum of $450. * * ''

The defendant, answering, admitted the execution of an agreement with plaintiff substantially as quoted in paragraph 4 of plaintiff's complaint. It set out section 3 of the contract, and averred the following defensive matter:

''That during the year 1921, and prior to the —— day of June, 1921, plaintiff herein, as the agent of the defendant herein, collected and received for the defendant herein, certain moneys as renewal premiums in excess of the sum of $3,000, which money was and is the property of the defendant herein, and failed, neglected and refused to pay over said money so collected to this defendant, and withheld the same after demand therefor was made upon him, the said plaintiff, by this defendant, and by reason thereof, the defendant herein, on the —— day of June, 1921, discharged the plaintiff from its employ, and thereby terminated such contract of agency between the plaintiff and defendant, and by reason thereof, and by reason of the terms and conditions of plaintiff's said contract, an alleged copy of which is attached to plaintiff's complaint herein and marked Exhibit A, the plaintiff herein has ceased to be entitled to any renewal or other commissions upon any premiums paid or to be paid to this defendant.

''Defendant admits the first section of paragraph 7 of plaintiff's said amended complaint as to the conditions under which the said contract between the parties might be terminated, and admits that said contract might be terminated for such other causes, if any, as are stated therein. This defendant denies, however, each and every other allegation contained in said paragraph 7, and the whole thereof, and alleges

and states the fact to be that the said contract referred to states the entire agreement between the parties thereto, and further states that no understanding or agreement existed between plaintiff and defendant except as is stated in said contract.''

The defendant set out Section 21 of the insurance contract, and then averred:

''The total amount of business produced by the second party and his agents and accepted by the first party during the continuance of this agreement, excluding business produced in the current calendar year, to wit: 1921, and policies carried under extended insurance, as referred to in said contract, is $1,347,609. Of this amount, the insurance at the close of business on December 31, 1920, in force, was the sum of $677,923, which amount was less than 60 per cent. of all the business produced by said second party and his agents * * .
''Defendant further states that by reason of the foregoing facts the plaintiff is not entitled to any amount whatsoever by way of renewal commission or otherwise.''

The trial of the cause commenced September 12, 1922, and terminated on September 25th with a verdict for the plaintiff. The defendant appeals from the judgment entered thereon, assigning many errors involving the construction of the agency contract, the admission and rejection of evidence, and the giving and refusal to give certain instructions to the jury.

REVERSED AND REMANDED.    REHEARING DENIED.
COSTS TAXED.

For appellant there was a brief over the names of *Mr. Guy C. H. Corliss* and *Messrs. Joseph, Haney & Littlefield,* with oral arguments by *Mr. Corliss* and *Mr. E. V. Littlefield.*

For respondent there was a brief over the names *of Mr. Coy Burnett, Mr. W. D. Burnett, Mr. J. M. Scudder* and *Mr. J. Hunt Hendrickson,* with an oral argument by *Mr. Coy Burnett.*

BROWN, J.—It is vigorously contended that the insurance contract involved in this litigation has no permanent duration and that the alleged act of the defendant in terminating the contract on May 18, 1921, created no liability for damages for breach thereof. Defendant now asserts, on appeal, that the contract is without mutuality and, hence, terminable at will without liability.

That the plaintiff has the right to be indemnified by his principal for all acts done by him in good faith during the life of the agency contract is not questioned. The objection relates solely to the executory obligations of that agreement. The question, as presented by defendant, is this: Were the contract obligations binding on the defendant on May 18, 1921?

The insurance contract executed between the parties to this litigation contained extraordinary inducements to plaintiff to engage in the establishment of the American Life Insurance Company in the State of Oregon, where there were many older and better known companies then engaged in business.

Plaintiff undertook to devote, and did devote, all of his time to defendant, and in addition to commissions was to receive, as compensation, a salary of $100 a month. Such commissions were the initial commissions on writing the insurance, together with commissions on all renewal premiums paid upon the policies written.

Defendant does not deny that plaintiff entered upon the performance of his duties under his agency con-

tract; that on May 18, 1921, the date of the alleged breach of the contract, he had written accepted insurance in the sum of $1,579,809, and that of this sum $1,055,523 was in force on that date.

Prior to the alleged breach, Mr. C. L. Ayers, president of the Northern Assurance Company, for himself and a syndicate, purchased a controlling interest in the stock of the defendant company, with the intention of consolidating the two life insurance companies, and in the early part of the year 1921 negotiations were had for the merger of the defendant company into the Northern Assurance Company. For the purpose of changing the contracts with the general agents to fit the new situation, a meeting was called to be held at Des Moines, Iowa, the headquarters of the defendant company. Wallace asserts that at that meeting Ayers repudiated plaintiff's agency contract.

That the plaintiff has succeeded in introducing a comparatively unknown company into the territory of Oregon must be conceded. During the life of his contract with the company, its officers wrote many communications to plaintiff commending him for his efforts and encouraging him in building up his agency in this state. Wallace was highly commended for putting the "American Life on the map to stay in the state of Oregon." During the term of his employment he was also assured by the company's representatives that in the course of a few years he would have an agency that would pay him handsomely for his efforts. The vice-president wrote of the time when Wallace would have $2,000,000 of renewal insurance, and that with that much good business on his books his agency should be worth $25,000 if he wished to sell.

The contract contained no express provision as to its duration. It did contain stipulations for its termination.

Alluding to the termination of the relation existing between principal and agent, it has been said, concerning the power of revocation:

"Where the parties have stipulated for the right to terminate for a certain cause, there is an implied exclusion of the right to terminate for any other cause which would not justify a termination in the absence of any stipulation.

"But a contract fixing no term for its continuance, and therefore terminable at will, will not be rendered not so terminable by the mere insertion of provisions by which it may be terminated in certain events. Such provisions would not ordinarily be sufficiently indicative of an intention to agree that a contract, otherwise terminable at will, should be terminated only in the cases provided for; and they would ordinarily be deemed to be cumulative and inserted only out of abundant caution." 1 Mechem on Agency (2 ed.), § 594.

In support of the first proposition, the author cites, under note 82, *Newcomb* v. *Imperial Life Ins. Co.,* 51 Fed. 725. To the same effect, see *Newhall* v. *Journal Printing Co.,* 105 Minn. 44 (20 L. R. A. (N. S.) 899, 117 N. W. 228).

Supporting the second proposition, under note 83, are cited: *Wilcox & Gibbs Co.* v. *Ewing,* 141 U. S. 627 (35 L. Ed. 882, 12 Sup. Ct. Rep. 94); *Stier* v. *Imperial L. Ins. Co.* (C. C.), 58 Fed. 843; *Moore* v. *Security Trust Ins. Co.,* 93 C. C. A. 652 (168 Fed. 496). To the same effect are 2 C. J., p. 537; 1 Joyce on Ins., § 721. The two authorities last noted cite in support of their text the case of *Stier* v. *Imperial L. Ins. Co.* (C. C.), 58 Fed. 843, alone. That case is similar to the one under consideration, but the agency contract in the case at

bar is, in some respects, more favorable to the agent than is the contract in the Stier case.

Much of the argument contained in defendant's brief is devoted to the discussion of the right of defendant to terminate the contract at will owing to the absence of mutuality therein. This is a clear departure from the theory set forth by the pleadings and at the trial of this cause.

From the record before us in the case at bar, the question of the right of the defendant to revoke the agency contract at will is not within the issues.

The plaintiff, at paragraph 7 of his complaint, averred:

"That in and by said contract it was further provided that the same might be terminated by defendant *solely* on account of culpable negligence, failure to carry out instructions of defendant, willful violation of law, failure to comply with the conditions of said contract, or grossly improper conduct by plaintiff herein."

The defendant, at paragraph 7 of its answer, expressly admitted the conditions under which the contract between the parties might be terminated to be as alleged by plaintiff, and averred that the plaintiff was discharged for cause, as provided in the contract. Its averment of the reason for plaintiff's discharge is set forth in our statement. Moreover, at the trial plaintiff claimed that the defendant had breached its contract with him. The defendant asserted, in effect, that it had not breached the contract, but that it had discharged the plaintiff for cause provided for in the contract.

"The Court (Interrupting): Is there any contention in this case that the company had a right to terminate this agency at any time by quitting business?

"Mr. Burnett: I understand not. Their contention, as I understand in the language of their answer, is for any of the causes mentioned in the answer. Isn't that right, Mr. Haney?

"Mr. Haney: For causes mentioned in the contract."

1. This court announced the following doctrine in *Durning* v. *Walz,* 42 Or. 109 (Syl. 2) (71 Pac. 662):

"Where a case has been tried on a certain theory, with the acquiescence of the parties, it must be so continued on appeal, and the Supreme Court will not permit a change of position in that tribunal."

To like effect see *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846); *Cobb* v. *Peters,* 68 Or. 14 (136 Pac. 656); *Winn* v. *Taylor,* 98 Or. 556 (190 Pac. 342, 194 Pac. 857).

A well-established rule in this jurisdiction is:

"A party cannot, when a cause is brought up for appellate review, assume an attitude inconsistent with that taken by him at the trial. * * Parties are restricted to the theory on which the case was prosecuted or defended in the court below. Thus, where both parties act upon a particular theory of the cause of action, they will not be permitted to depart therefrom when the case is brought up for appellate review. And the same is true where the parties act upon a particular theory of defense or of opposition thereto." 3 C. J., § 618, Appeal and Error.

"Where a cause has been tried upon the theory that the pleadings are at issue, or that a particular issue is made by the pleadings, or where an issue is tacitly accepted by all parties as properly presented for trial and as the only issue, the appellate court will proceed upon the same theory." 21 Ency. Pl. & Pr., p. 667.

2, 3. The defendant contends that the plaintiff has forfeited all claims accruing under its contract with the plaintiff because of his entering into the employ-

ment of another life insurance company during the time he was indebted to the defendant.

A forfeiture is in the nature of a penalty. Before the defendant can avoid the demands of plaintiff because of forfeiture, it must plead its right upon which it predicates its cause for a forfeiture. It has made no averments in its answer in relation thereto. However, under the issue made by the pleadings relative to damages, the defendant had a right to prove the declaration of the plaintiff in reference to his subsequent employment. The alleged damages are unliquidated, and the defendant had a right to the proposed evidence to lessen or overthrow the alleged damages sustained by plaintiff.

4. The plaintiff in this action could recover lawfully only the present value of the sums due on renewal policies: *Brighton* v. *Lakeshore & M. S. Ry. Co.*, 103 Mich. 420 (61 N. W. 550); *Stearns* v. *Lakeshore & M. S. Ry. Co.*, 112 Mich. 651 (71 N. W. 148).

5. In the event of an unlawful revocation of the plaintiff's contract, he has a right to recover damages if his contract was a thing of value.

In the leading case of *Wakeman* v. *Mfg. Co.*, 101 N. Y. 205 (4 N. E. 264, 54 Am. Rep. 676), the court announced the law. It said:

"Most contracts are entered into with a view to future profits, and such profits are in the contemplation of the parties, and, so far as they can be properly proved, they may form the measure of damage. * * When a contract is repudiated, the compensation of the party complaining of its repudiation should be the value of the contract. He has been deprived of his contract, and he should have in lieu thereof its value, to be ascertained by the application of rules of law which have been laid down for the guidance of courts and jurors."

Error is assigned because of the ruling of the court upon the question put to witnesses calling for their opinion as to the value of plaintiff's insurance agency contract. Defendant contends that an agency is not a commodity having a value to be determined by opinion evidence; further, that the contract was a personal one, and that plaintiff could not, without defendant's consent, sell or assign to another person his right to act as general agent for the defendant. Defendant argues,—and cites much authority in support of its contention—that expert testimony is not admissible to prove the value of this contract.

6. It is a general rule that in a court of justice it is the duty of a witness to state facts within his personal knowledge, and not to testify to hearsay or give opinion evidence.

The doctrine is thus stated in *State* v. *Barrett,* 33 Or. 194 (54 Pac. 807):

"As a general rule, a witness must testify to facts, and not conclusions or opinions. It is the duty of the jury, and not the witness, to draw inferences from the evidence, and form opinions from the facts presented. The cases in which the opinions of witnesses are allowed constitute exceptions to this rule, founded on the ground of necessity, because the facts cannot be presented or depicted to the jury precisely as they appeared to the witness, and it is impracticable, from the nature of the subject, for him to relate the facts without supplementing their description with his conclusions: *First National Bank* v. *Fire Assn.,* 33 Or. 172 (53 Pac. 8). Such are questions as to the identity of persons or things; the age, health, physical condition, and appearance of a person; the lapse of time; the dimensions and quantities of things; and many other instances in which it is impossible to detail the facts without the use of language which necessarily implies the conclusion or opinion of the witness (citations). But the books all agree that such opinion

evidence is never admissible if all the pertinent facts can be sufficiently described and detailed to the jury so as to enable it to draw its own inferences and conclusions therefrom (citations)."

7, 8. This court has approved the rule that expert testimony should be received and weighed with caution: *Wendl* v. *Fuerst,* 68 Or. 283 (136 Pac. 1).

The record of this cause contains an instructive commentary upon the worth of opinion evidence. A number of intelligent, capable and honorable witnesses testified that plaintiff's agency contract, at the time of the averred breach, was worth from fifty thousand to one hundred and fifty thousand dollars. Upon the other hand, the defendant's witnesses, apparently equally intelligent, capable and honorable, and well versed in the insurance business, in answer to the precise question put to the plaintiff's witnesses, testified that the agency contract possessed no value.

The law is thus concisely stated:

"As the opinion evidence rule is intended to provide against the mischief of invasion of the province of the jury, a court should, as far as possible, exclude the inference, conclusion, or judgment of a witness as to the ultimate fact in issue." 22 C. J. (Evidence), § 597.

To the same effect are *Pacific Live Stock Co.* v. *Murray,* 45 Or. 103 (76 Pac. 1079); *Montgomery* v. *Somers,* 50 Or. 259 (90 Pac. 674); *Everart* v. *Fischer,* 75 Or. 316 (145 Pac. 33, 147 Pac. 189); *Marks* v. *Columbia Co. Lbr. Co.,* 77 Or. 22 (149 Pac. 1041, Ann. Cas. 1917A, 306).

"As a general rule a witness, even though he be a plaintiff seeking to recover, cannot state his conclusion as to the amount of damage which has been suffered by reason of a legal wrong such as * * the breach of a contract. The reasons for the rejection are that this is precisely the point upon which the

jury are to pass, and that the statement is often rather a conclusion than an estimate, and involves establishing or using a legal standard of liability." 22 C. J. (Evidence), § 598.

A leading case on the subject of opinion evidence, involving the question of the value of an agreement is *Wakeman* v. *Wheeler & Wilson Mfg. Co.,* 101 N. Y. 205, 217 (4 N. E. 264, 54 Am. Rep. 676). That court said:

"We think the opinions of witnesses, as to the value of the agreement, as to the profits which it or any agency established in pursuance of it could produce, as to the damages plaintiffs realized, and as to the number of machines they could have sold, were properly excluded. This was not a case for expert or opinion evidence. There was no certain basis of facts proved or facts assumed upon which an opinion could be based. The conflicting opinions of interested witnesses, selected because of their favorable opinions, instead of aiding the jury, would probably add to their embarrassment. The safer rule in all such cases is to exclude opinions and receive the facts, and then leave the matter for the determination of the jury. They may not have any certain basis upon which to rest their judgment, but that cannot be helped. They are supposed to be disinterested, and must apply their experience and common sense to the facts proved, and reach the best results they can."

In *Nash* v. *Thousand Island Steamboat Co.,* 123 App. Div. 148 (108 N. Y. Supp. 336), the court says:

"We think there can be no question that the Wakeman case covers the case we are here considering and authorizes the recovery of substantial damages for breach of the contract in question, provided the jury shall find, upon proper and sufficient evidence, that such damages were suffered by the plaintiffs. Those damages could not be proved or disproved by such expert or opinion evidence as was given or offered

111 Or.—34

on the trial. The Wakeman case so held, and such holding has been approved of in many cases since decided.''

*Wakeman* v. *Wheeler & Wilson Mfg. Co., supra,* was cited in *Ellsler* v. *Brooks,* 54 N. Y. Super. Ct. 73, holding that opinions of experts as to what plaintiff would have made if allowed to fulfill contract, unsupported by facts, are incompetent; *Reed* v. *McConnell,* 101 N. Y. 270 (4 N. E. 718), holding that opinion of witnesses as to value of partnership contract to plaintiff or his share of profitable profits is incompetent; *Kirkman* v. *Kirkman,* 26 App. Div. 395 (49 N. Y. Supp. 683), holding opinion of expert as to value of good will of partnership incompetent; *Kochmann* v. *Baumeister,* 73 App. Div. 309 (76 N. Y. Supp. 769), holding that opinion of employee as to estimate of loss sustained by breach of contract of employment is incompetent; *Benyakar* v. *Scherz,* 103 App. Div. 192 (92 N. Y. Supp. 1089), holding improper to allow plaintiff to testify to his opinion as to gross receipts from booths for season, on breach of contract therefor; *Devlin* v. *New York,* 4 Misc. Rep. 106 (23 N. Y. Supp. 888), holding that witnesses cannot be allowed to testify directly to their estimates and opinions of value of contract and probable amount of profit during its unexpired term.

See 20, Notes to American Reports, pp. 264–268.

In the case of *Miller* v. *Lerdo Land Co.,* 52 Cal. App. 662 (199 Pac. 1073), the Court of Appeals of California, in commenting upon the opinions of witnesses, wrote:

''We think that the correct rule is stated in the note found in L. R. A. 1916B, at page 875. 'And opinion evidence as to the value of an exclusive agency contract and the profits which might have been

made or the amount of business which might have been done under the agency if it had not been wrongfully terminated is not admissible, since such opinion would be purely speculative and conjectural.' "

The opinion also quotes with approval from *Wakeman* v. *Wheeler & Wilson Mfg. Co., supra.*

What method should be adopted in arriving at the value of the contract for the purpose of ascertaining the damages, if any, suffered by the plaintiff?

An instructive case is that of *Wells* v. *National Life Assn. of Hartford,* 99 Fed. 222 (53 L. R. A. 53, 39 C. C. A. 476). The contract involved in that case was an insurance contract, entered into by the National Life Assn., in writing, with one Miller, whereby he was appointed manager for the company in the State of Arkansas and part of the State of Texas. The writing provided that the contract might be sold or assigned with the consent of the company, and that it should terminate within ten years from date. Miller sold and transferred the contract to the plaintiff and one W. T. Shaw, the defendant consenting thereto. These parties later released their contract right to represent the insurance company in Arkansas. Thereafter the plaintiff purchased Shaw's interest in the contract. His petition averred that he devoted his time and energies to representing the defendant in performing his duties as such agent; that the defendant breached the contract and thereafter employed Miller and other agents and agencies to solicit applications and sell insurance for it and to do the work that the plaintiff could and would have done had it not been for the breach.

One of the inquiries in that case involved the question of how to arrive at the profits that might have

been realized by the plaintiff under his contract with the defendant. The court said:

"The condition of the business in Texas at the time of the breach; the means that had been used and were being used by the plaintiff to work the territory allotted to him; the machinery which he had organized for the purpose of that work; the reasonable cost of its continued operation; the extent of the territory allotted to him; the number of persons therein who were fit subjects for such insurance as the defendant proposed to write; the reasonable relative proportion of cost for the first year of organizing the business and putting it in operation, to the cost of continuing its conduct during the subsequent years; the machinery actually used by the defendant after it entered the territory allotted to the plaintiff, and its success, through the use of this machinery and the agencies it established, in obtaining applicants for insurance and holders for its policies,—should all be given to the jury, under the proper instruction of the court, that the panel of twelve reasonable men, in the effort to do justice between the parties, may find, from a full consideration of the relations of the parties, and their respective relations to the work, as shown by the proof, the reasonable amount of damage that the plaintiff has suffered by the defendant's breach of the contract. This indication of the elements of proof to be admitted in the case is not, and is not intended to be, exhaustive. Other kindred matter may, and doubtless will be, offered. The subject is not one for what is technically called 'expert testimony.' Witnesses should not be permitted to give what may properly be called 'opinion evidence' as to the value of the contract at the date of its breach."

In *Cook* v. *Stimson Mill Co.*, 41 Wash. 314 (83 Pac. 419), the court approved the following from *Briggs* v. *Minneapolis St. Ry. Co.*, 52 Minn. 36 (53 N. W. 1019).

"Courts have gone far enough in subjecting life, liberty and property to the mere speculative opinions of men claiming to be experts, and we are not dis-

posed to extend the rule into the field of mere hypothetical conjecture, which, in a case like the present, must necessarily have been so uncertain and unreliable as to be purely conjectural, and utterly unsafe for either court or jury to adopt.''

That excerpt is also quoted with approval by our court in *Everart* v. *Fischer,* 75 Or. 316 (145 Pac. 33, 147 Pac. 189).

The court committed error in admitting the opinion evidence over defendant's objection.

9. The plaintiff contends that the defendant has waived its right to complain of the court's ruling on the offer of opinion evidence, because it met plaintiff's expert witnesses with expert witnesses and offered ''opinion evidence'' against ''opinion evidence,'' and, to uphold his contention, cites a number of authorities, among others the case of *Henderson* v. *Morris,* 5 Or. 24, 28. That case does not support the plaintiff. The litigant therein complained of an error which he invited; whereas, in the case at bar, the defendant did not invite error, but protested against the reception of ''opinion evidence'' and reserved its exceptions to the court's erroneous rulings. It did not waive its exceptions thus reserved. The weight of authority is in harmony with this view.

Yet the plaintiff's contention is not without support by judicial decisions.

In *C. K. & N. R. R. Co.* v. *Wiebe,* 25 Neb. 542 (41 N. W. 297), the court wrote:

''Evidence similar to that objected to was introduced by the plaintiff in error. The alleged errors, therefore, cannot be considered.''

In *St. Louis I. M. & S. Ry. Co.* v. *Flinn,* 88 Ark. 484, 489 (115 S. W. 142, 144), the court, discussing the

admissibility of the testimony of a witness over the objection of the appellant, said:

"Appellant cannot complain of the introduction of this evidence. Counsel for appellant adopted precisely the same kind of testimony to prove their version of how the accident occurred, and have therefore waived the error, if any was committed."

But the weight of authority is otherwise. Among the decisions, we note the following:

In the case of *Washington etc. Co.* v. *McCormick,* 19 Ind. App. 663 (49 N. E. 1085), one of the parties objected to the admission of evidence, which objection was overruled, and thereafter adduced evidence of the same character in rebuttal of the evidence objected to. In that case it was urged, as it is here, that the objector had waived his right to question the court's ruling on appeal. The court said:

"After the court had held, over appellant's objection, that the evidence was competent, and had permitted appellee, who had the burden, to introduce such evidence to maintain his case, appellant, in seeking to overcome the case made by appellee, could follow the theory laid down by the court without impliedly admitting the court's theory to be right, and without waiving his right to question the court's action."

In *Winn* v. *Christian Co. Coal Co.,* 156 Ill. App. 179, it was held that it was not a waiver of the litigant's exception and objection to rebut incompetent evidence by evidence of like character.

In the case of *San Antonio & Aransas Pass Ry. Co.* v. *DeHam,* (Court of Civil Appeals of Texas), 54 S. W. 395, it is said:

"It is contended, however, that, after the admission of the objectionable evidence, defendant also offered proof upon the matter, and is, therefore, estopped to complain. We do not think this contention sound. A

defendant has the right to meet the plaintiff's case, as made under the rulings of the trial judge, and, after making objection and reserving proper exceptions, may combat the testimony of plaintff, whether correctly admitted or not, without losing his rights on appeal.''

From *Horres* v. *Chemical Co.*, 57 S. C. 192 (52 L. R. A. 36, 35 S. E. 501), we carve:

''But the respondent contends that, inasmuch as the defendant, after the ruling of the circuit judge by which the testimony of plaintiff was allowed as competent, offered similar testimony, therefore, defendant has waived his objection to such testimony. * * It cannot be good law that, after a party has excepted to the ruling of the presiding judge, admitting incompetent testimony (which ruling is the law of the case on that trial in the circuit court), the exceptor is prevented from cross-examining plaintiff's witness on the matter excepted to, or in offering testimony in his own interest on the same line.''

In the case of *Richardson* v. *Webster City*, 111 Iowa, 430 (82 N. W. 920), the trial court held that certain questions put to the witnesses as to the amount of damages suffered by the plaintiff were improper as calling for conclusions and thereby the witnesses usurped the province of the jury. It was there asserted on appeal, as it is here, that the defendant had waived its objection because it had asked similar questions of its own witnesses. The court wrote:

''It is said by counsel for plaintiff that similar questions were asked by defendant of its witness. This does not prevent it from taking advantage of the exceptions it has preserved.''

In the case of *Chicago etc. Ry. Co.* v. *Uhter*, 212 Ill. 174 (72 N. E. 195), it was held that the appellant does not waive his right to his exception to testimony

admitted over his objection by offering evidence of the same character in his own behalf in reply thereto.

"A party does not waive his objection and exception to the admission of incompetent evidence by attempting to disprove the matters testified to or to prove facts inconsistent with them. A party excepting to the admission of testimony is not bound to concede its truth, or to refrain from combating it in order to retain his exception." Baylie's Trial Practice (2 ed.), p. 292.

In *Martin* v. *New York, N. H. & H. R. R. Co.,* 103 N. Y. 626 (9 N. E. 505), it was urged, as here, that the defendant had waived his objection and exception by producing similar proof in an attempt to disprove his adversary's testimony. The Supreme Court of New York said:

"The defendant did not waive his objection and exception by attempting to disprove the matters testified to, or to prove facts inconsistent with them. A party excepting to the admission of testimony is not bound to concede its truth, or to refrain from combating it, in order to retain his exception."

In *Douglas* v. *New York Elevated R. R. Co. et al.,* 14 App. Div. 471, 473 (43 N. Y. Supp. 847), a similar case, the court said:

"We do not think there was any waiver. By introducing a particular class of evidence in his own behalf to meet his opponent's evidence of the same character which he has in vain asked the court to keep out of the case, a party who has taken the proper objection and exception does not lose the right to insist upon appeal that the court erred in receiving such evidence in the first instance."

To like effect are *Lyons* v. *New York El. R. R. Co.,* 26 App. Div. 57 (49 N. Y. Supp. 610); *Woods* v.

*Buffalo R. R. Co.,* 35 App. Div. 203 (54 N. Y. Supp. 735).

10. The plaintiff also asserts that the defendant waived its objection to the admissibility of plaintiff's opinion evidence by cross-examining the witnesses regarding the matter after the evidence had been admitted over its objection, and cites a number of authorities in support of his contention. Those decisions follow the minority rule. By the great we'ght of authority in this country, an exception is not waived by the objecting party in cross-examining the witnesses relating to the inquiry after the evidence has been admitted into the record over objection.

In the case of *Mrs. M. W. Cathey, Plaintiff in Error,* v. *Missouri K. & T. Ry. Co. of Texas,* 104 Tex. 39 (133 S. W. 417, 33 L. R. A. (N. S.) 103), the court held:

"It would, indeed, be a strange doctrine, and a rule utterly destructive of the right and all the benefits of cross-examination, to hold a litigant to have waived his objection to improper testimony because by further inquiry he sought on cross-examination to break the force or demonstrate the untruthfulness of the evidence given in chief, in the event, as would most usually occur, that the witness should on cross-examination repeat or restate some or all of his evidence given on his direct examination."

The doctrine announced by the Supreme Court of Texas is supported by the weight of authority, as will be seen from the list contained in a valuable note to the above case, in 33 L. R. A. (N. S.), p. 103.

11. The trial court, upon the objection of plaintiff, made a ruling which excluded as evidence defendant's exhibit 135. This exhibit is a written communication from plaintiff to M. E. Latta as vice-president of the defendant company. The defendant asserted that the

writing is admissible as a declaration against interest, and is competent upon the question of the value of the plaintiff's agency. Plaintiff's objection was that the writing constituted an offer of compromise. The exhibit reads:

"Mr. M. E. Latta,
  "American Life Insurance Co.
"Dear Sir:
  "I make the following proposal to you in checking out my agency:
  "1. I agree to pay all moneys collected on renewals and renewal premium notes at once as checked by Mr. Latta.
  "2. I agree to pay at once all notes due on business written by this agency as checked by Mr. Latta.
  "3. I agree to waive all claims against the company of every description.
  "4. I agree to help to the best of my ability to conserve the business of the American Life in Oregon for a period of 90 days, without cost to the American Life.
  "The above four agreements are to be carried out upon the American Life Insurance Company paying me $7,500 in lieu of all my contract rights with that company, $2,500 to be paid in cash and the balance deferred if necessary.
                    "(Signed)   LEW WALLACE."

Mr. Latta testified that he had served upon the plaintiff defendant's exhibits 133 and 134, and that "I don't remember that I had any other or further negotiations with him."

Defendant's Exhibit 134 is a demand from Vice-President Latta for a delivery to him, as such officer, of all moneys, notes, securities, and other personal property belonging to the company that had been received by, and were in the possession of, plaintiff. Defendant's Exhibit 133 purports to be a discharge of plaintiff from the employ of defendant com-

pany, served upon him after the written demand above
noted was made.

Mr. Latta testified, among other things, concerning
Defendant's Exhibit 135:

"Q. It was an effort, at least, on Mr. Wallace's
part, to compromise?

"A. It was an effort on Mr. Wallace's part. I
would not say it was a compromise.

"Q. You can read it. It says he will take so much.

"A. He made this proposition to me as a represen-
tative of the American Life Insurance Company. * *

"Q. Mr. Latta, didn't Mr. Wallace, as you have
stated heretofore, say to you when you asked him to
settle with you, that there were some matters he
wanted a settlement from the company on before he
paid you?

"A. He did.

"Q. And didn't you say those matters of necessity
he would have to take up with the home office, that
you were without authority to settle them?

"A. I did. * *

"Q. What did he give that to you for?

"A. He delivered this to me at the hotel, as you
say, probably a basis of compromise, on his own sug-
gestion."

"An offer of compromise is not an admission that
anything is due; but admissions of particular facts,
made in negotiation for compromise, may be proved,
unless otherwise specially agreed at the time."
Or. L., § 879.

In the case of *Marshall* v. *Olson,* 102 Or. 502, 509
(202 Pac. 736), Grace Olson, wife of the defendant
Olson, while under cross-examination, was asked the
following questions:

"Q. Why did you offer to settle this for half?"

Objection was interposed and overruled by the
court.

"Q. Did you offer to settle for half?

"A. Yes, sir, Mr. Olson did.

"The Court: Did he make that with your consent and approval?

"A. Yes."

This court held, on appeal, speaking through Mr. Chief Justice BURNETT:

"It would seem that the evidence sought to be adduced by this question would come within the operation of that section (Or. L., § 879) as an offer to compromise, and hence would not be admissible against the defendant."

See also *Coos Bay Navigation Co.* v. *Endicott,* 34 Or. 573 (57 Pac. 61).

"The law favors the settlement of controversies out of court, for which reason a person is entitled to 'buy his peace,' or to endeavor to do so, without danger of being prejudiced in case his efforts should fail. * * The rule in this respect excludes not only the bare fact of the offer, but also all that occurred during the negotiations, including admissions made for the purpose of reaching an agreement as to an amicable settlement; and is applied with equal force whether the offer was made by the party against whom a claim is asserted or by the party who asserts a claim, and whether the offer was made before or after the commencement of the action. * * An offer of compromise is inadmissible, not only on the issue of the existence of liability, but also on the issue of the amount of liability. * * " 22 C. J., § 347.

Did the exhibit constitute an independent admission or declaration of the value of the agency contract? If so, it is competent evidence. Upon the other hand, if it was made as an offer to "buy his peace" with the defendant, it was an offer of compromise and the objection thereto was properly sustained.

Whether such a declaration constitutes an independent admission of the value of property, or whether it is a mere effort to "buy one's peace" has often arisen, especially in eminent domain cases; and

whenever the record presents that question, the peculiar facts surrounding the individual case should be considered.

In the case at bar, the following circumstances are illuminating:

At the time the offer in question was made, Wallace's accounts with his former principal were under examination. His agency was being checked out. The insurance company had claims against him. He was asserting claims against it. The vice-president of the company, to whom the offer was made, was on the ground for the purpose not only of going through the accounts, but for the purpose of receiving from Wallace all company property. In consideration of all these circumstances, especially when taken in connection with the writing and the testimony of the company's representative to whom the proffer was made, we must hold that the trial court did not abuse its discretion in ruling that the exhibit was an offer of compromise and inadmissible as evidence.

12. The construction of written instruments is for the court: Or. L., § 715. In *Henry* v. *Harker,* 61 Or. 276 (118 Pac. 205, 122 Pac. 298), Mr. Justice BURNETT, in speaking of the duty of the court to construe a contract, said:

"The construction of a contract is always a matter of law for the court. If technical words or terms of art or local phrases not in common use are introduced, or if it is uncertain to what person or what thing a writing refers, oral evidence may be introduced to explain the language used, or if the language itself is not clear and it can be shown that both parties placed a particular interpretation upon it and acted upon that interpretation, evidence showing such interpretation may be admitted. But when, as in this case, the contract consists wholly of a writing or

series of writings, all admitted to be genuine and containing no technical terms, the construction of the writings becomes a matter of pure law for the court (citations), and this rule is even applied to oral contracts where their terms are not disputed (citation)."

But in the instant case, the jury seem to have followed the pleadings as to the construction of the contract.

Because of the errors hereinbefore indicated, this cause is reversed and remanded for a new trial.

REVERSED AND REMANDED. REHEARING DENIED.
COSTS TAXED.

BEAN and RAND, JJ., concur.

McCOURT, J., sat, but took no part in this decision.

---

ON PETITION FOR FURTHER OPINION.

(227 Pac. 465.)

For appellant there was a brief over the names of *Messrs. Joseph, Haney & Littlefield* and *Mr. Guy C. H. Corliss.*

For respondent there was a brief over the names of *Mr. J. M. Scudder, Mr. J. Hunt Hendrickson, Mr. Coy H. Burnett* and *Mr. W. D. Burnett.*

BROWN, J.—The defendant and appellant in this case has petitioned the court to pass upon a point raised upon the trial and argued in the brief, for the averred reason that if this particular point should be decided in favor of the appellant, it would terminate the action. Defendant also asserts that it is to the great advantage of plaintiff to have the point settled,

"for it would indeed be very unfortunate for the plaintiff if, after another trial, on the second appeal this court should hold that there had been no breach of the contract and that plaintiff therefore was not entitled to recover."

When this case was before us, we considered the point made by defendant in its appeal; and, had there been a lack of evidence to take to the jury the question of the breaching of the contract by defendant on May 18, 1921, as alleged, we should have terminated the case at that point instead of reversing it on other grounds.

On November 19, 1915, the plaintiff and defendant entered into a life insurance agency contract whereby the plaintiff was appointed general agent for defendant for the State of Oregon. The contract involved the undertaking of establishing a new company in a well-occupied field, and, for the labor which this required, provided adequate consideration.

That the plaintiff entered upon the execution of his contract and secured a large amount of business for defendant within the State of Oregon, and that he expended a large sum of money in establishing his agency within this state, there is no question. For a detailed statement of the facts, see opinion of this court rendered April 15, 1924, and reported in 225 Pac. 192.

The plaintiff averred that at Des Moines, Iowa, on May 18, 1921, the defendant breached its contract with him. It appears that prior to this time the controlling interest in the defendant company was acquired by one C. L. Ayers, president of the Northern Assurance Company, by the purchase of the stock of the defendant company for himself and a syndicate. After securing control of the American Life Insurance

Company of Des Moines, Iowa, Ayers, with a view of consolidating the two companies, attempted to change the form of policy to be written by the Iowa company in the future, and the rate of premium thereon, and, likewise, attempted to secure new contracts with the general agents. To this end, a call was issued to the general and prospective agents, to meet with Mr. Ayers at Des Moines, Iowa. In response, plaintiff went to Des Moines.

Plaintiff's testimony is to the effect that the general agents, in order to learn what Ayers intended to do with reference to their contracts, invited him to come before them and explain. Plaintiff testified:

"We called him (Ayers) in and told him naturally we wanted to know what was going to happen—if we were going to continue writing business under our contract as we had—and in response to that Mr. Ayers got up and seemed a little bit inclined to be irritated about it, and he said: 'Gentlemen, there is only one state agent that has a vested interest in his contract, and we bought this company and paid our money for it, and it is ours, and you can do what you damn please.'"

Plaintiff testified, in effect, that Ayers called him into a room and informed him of certain changes that were to be made in their future contractual relations; that he told Ayers he wanted to maintain his original contract; that Mr. Ayers answered:

"Of course, if you are insisting on your contract, we would take all the policies we have been writing off the books and you wouldn't have anything to write."

And that Ayers then called in a stenographer and dictated his proposed contract, which materially affected the commission that plaintiff was receiving on renewals and entirely eliminated his salary.

An effectual method of discharging a man is to cut off his salary. This, the plaintiff says, is what was done in the instant case.

In view of the construction which we are required to place upon the plaintiff's testimony in the disposition of this point, we hold that there was no error committed by the court in submitting to the jury the question of plaintiff's discharge: Page on Contracts, §§ 2904, 2909; Mechem on Agency (2d ed.), § 617.

BEAN and RAND, JJ., concur.

McCOURT, J., took no part in this decision.